UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LEAH KOZAK,

        Plaintiff,

  v.

                                      **DECISION AND ORDER**
                                          20-CV-184S

CSX TRANSPORTATION, INC.,

        Defendant.

## I.  INTRODUCTION

In this action, Plaintiff Leah Kozak, a transgender woman, alleges that Defendant CSX Transportation, Inc., unlawfully discriminated against her on the basis of sex and disability when it terminated her employment after she urinated in a rail yard, a practice for which she claims non-transgender, non-disabled employees are not disciplined. Before this Court is CSX's motion for summary judgment. (Docket No. 50) This Court will grant CSX's motion as to Kozak's disability claim, but deny it as to her sex-discrimination claim because there exist disputed issues of material fact that preclude summary judgment.

## II.  BACKGROUND

Unless otherwise noted, the following facts are undisputed for purposes of the motion for summary judgment. This Court takes the facts in the light most favorable to Kozak, the non-moving party. See Mitchell v. City of New York, 841 F.3d 72, 75 (2d Cir. 2016) (at summary judgment, a court "views the evidentiary record in the light most

1

favorable to ... the non-moving party").

Kozak was employed by CSX from September 1999 until her dismissal in July 2019. (Complaint, Docket No. 1, ¶ 37.) In late 2018, she came out as transgender and began to transition to female. (Id., ¶ 42.) She began taking hormone-suppressing medication to treat her gender dysphoria. The medication she was taking, spironolactone, had a side effect of frequent urination. (Id., ¶ 45.) She also began to present with more feminine characteristics and body styling. (Id., ¶¶ 43-45.) In December 2018, she informed Mike Lewandowski, a CSX supervisor, of her transition. (Docket No. 68, ¶ 3.) Kozak informed Lewandowski that she would need to urinate more frequently due to her medication but did not request permission to use the bathroom more frequently.  (Id., ¶¶ 7-8.) Kozak asserts that she did not specifically request additional bathroom access because she believed that she was permitted to urinate in the rail yard as needed. (Id.) At some later point, Kozak told Lewandowski that it would be helpful to have portable toilets in the rail yard. (Id., ¶ 17.)

On June 13, 2019, while Kozak was working in CSX's Buffalo rail yard, she urgently needed to urinate. (Id., ¶¶ 48, 51.) During a pause in the rail activity, she walked to a nearby shanty and urinated against it, taking care not to expose herself. (Id., ¶¶ 52-54.) The parties dispute how far the shanty was from the nearest restroom, with both sides submitting map images purporting to show the locations of available restrooms. (Compare Docket No. 75-1 with Docket Nos. 68, ¶¶ 47, 49; 71-1.) The parties also dispute whether CSX rules permitted Kozak to stop working and take the time she would need to walk to the nearest bathroom to relieve herself. (Compare Docket No. 75-1, ¶ 8 with Docket No. 68, ¶¶ 40, 50-52.) Kozak asserts that employees only left their work areas to walk to a

building with a restroom for a bowel movement, not when they needed to urinate. (Docket No. 68, ¶ 51.) The record contains emails from CSX employees stating that it was a common practice, if a restroom was not nearby, for employees to urinate outdoors. (See Docket No. 70-2.) CSX employee Joseph Stachewicz declared that, in his 23 years of employment at CSX, "there has never been a problem with having to urinate outside because there are no facilities available." (Docket No. 70-6 at p. 2.)

Trainmaster Amanda Dellinger was monitoring CSX's movable security cameras at this time as part of her job. (Docket No. 50-3 at p. 8.) Stachewicz declared that he had overheard Dellinger saying transgender people were "unnatural and disgusting and against God." (Docket No. 70-6 at p. 2.) Dellinger testified that she did not remember saying this but also testified that she "did not agree" with Kozak's gender transition. (Docket No. 50-3 at p. 20.)

When she observed Kozak walk away from her post, Dellinger followed her with the camera and observed Kozak standing with her back to the camera, in a stance that indicated that she was urinating. (Id. at p. 9.) Dellinger informed Lewandowski, her supervisor, about what she had observed. (Id. at p. 10.) Dellinger asserts that Lewandowski instructed her to pull Kozak off duty and begin disciplinary proceedings. (Id. at p. 10.) Kozak asserts that, in her experience, the only time workers are taken immediately off the job is when there is a dangerous error, such as passing a red light. (Docket No. 68, ¶ 70.)

A hearing was held on June 20, 2019, at which CSX hearing officer Josh Greenway presided. (Docket No. 50-5.) Kozak was charged with the "lewd act of urinating in public." (Id. at p. 3.) Dellinger chose the charging language asserting that Kozak had committed

3

a "lewd act." (Id. at p. 11.) During the hearing, Dellinger testified to her observations of Kozak, and Kozak admitted to urinating against the shanty. (Id.) When Kozak's union representative asked what rules Kozak had violated, Dellinger first asked, "as far as the rule I charged her with, or is there an actual rule?" (Id. at p. 7.) Dellinger later stated that Kozak had violated Rule 104.1, stating that "employee behavior must be respectful and courteous," and Rule 2000.1, stating that employees must "observe all local, state, and federal laws and regulations." (Docket No. 50-5 pp. 8-9.)

Dellinger was "sequestered" after her testimony, but upon her return to the hearing, she stated that she had "googled" the legal issue, and stated that Kozak had broken the law because "public urination is illegal in all 50 states." (Id. at pp. 16, 32.) Dellinger provided a printout of the website she had consulted for this research. (Id. at pp. 44-46.) Greenway subsequently found Kozak guilty of violating both of the named CSX rules. (Docket No. 70-5 at p. 2.)

By notice dated July 16, 2019, CSX informed Kozak that she was dismissed from service because she had been found guilty of the "lewd act of urinating in public on CSX property," in violation of CSX Rules 104.2 and 2000.1. (Docket No. 50-8.) An arbitration board ultimately reinstated Kozak to her position but declined to grant her back pay. (Docket No. 70-1 at p. 3.)

Sometime after Kozak's dismissal, CSX installed portable toilets in the yard. (Id. at p. 18.)

Kozak filed a complaint alleging discrimination on the basis of disability and sex on February 10, 2020. (Docket No. 1.) On November 18, 2022, CSX moved for summary judgment on all of Kozak's claims. (Docket No. 50.) After briefing, this Court took the

4

motion under advisement without oral argument.

### III.  DISCUSSION

Kozak maintains that CSX discriminated against her based on her disability in violation of the ADA by failing to provide a sufficiently close restroom and then dismissing her after she was forced to urinate against the shanty. Kozak further contends that CSX dismissed her because of transgender status, in violation of Title VII.

CSX seeks summary judgment on Kozak's ADA and Title VII claims. It argues that Kozak is not covered by the ADA, that she has not made a prima facie case of sex discrimination, and that a reasonable jury could not find that CSX's reason for terminating her was a pretext.

**A.    Disability Discrimination under the ADA**

CSX makes three arguments regarding Kozak's ADA claim. First, it argues that Kozak's gender dysphoria diagnosis is excluded by a section of the ADA that specifically excludes certain "gender identity disorders" from coverage. It also argues that, even if the ADA applied to Kozak, no reasonable jury could find that she is disabled under the ADA's definition of disability. Finally, it argues that no jury could find that it failed to accommodate Kozak's alleged disability.

**1.  Legal Standards**

The Americans with Disabilities Act of 1990, 42 U.S.C. § 12112, provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of

5

employment." 42 U.S.C. § 12112 (a). "Discriminating" includes failing to make reasonable accommodations for an "otherwise qualified individual with a disability." 42 U.S.C. § 12112 (5)(a).

The statute defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102.

Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102 (2)(A). "Major life activities" also include the operation of a major bodily function, including but not limited to functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions. 42 U.S.C. § 12102 (2)(B).

The ADA categorically excludes certain groups from coverage. As is relevant here, Section 12211 specifically excludes from the definition of disability: "(1) transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders; (2) compulsive gambling, kleptomania, or pyromania; [and] (3) psychoactive substance use disorders resulting from current illegal use of drugs." 42 U.S.C. § 12211 (b).

In 2009, Congress amended the ADA to state that "the definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." 42 U.S.C. § 12102 (4)(A).

**2. § 12211's exclusion does not categorically exclude gender dysphoria**

6

CSX's first argument against Kozak's disability claim is that gender dysphoria, Kozak's allegedly disabling diagnosis, is categorically excluded from coverage because it is a "gender identity disorder[ ] not resulting from a physical impairment" as specified in Section 12211 (b).  Kozak argues that her gender dysphoria diagnosis is not excluded by the terms of Section 12211.

As the Fourth Circuit recently observed and both parties agree, "[t]he text of the ADA does not define the term 'gender identity disorders' and does not mention gender dysphoria at all. Thus, although the ADA specifically lists a number of exclusions from the definition of 'disability,' that list does not include gender dysphoria." Williams v. Kincaid, 45 F.4th 759, 766–67 (4th Cir. 2022), cert. denied, 143 S. Ct. 2414 (2023).

The question that divides the parties, and courts around the country, then, is whether gender dysphoria—a diagnosis that did not exist when Section 12211 was enacted—belongs in the category "gender identity disorders not resulting from a physical impairment" excluded by the section. This Court answers the question in the negative.

Section 12211 does not define the term "gender identity disorders." This Court must therefore determine the "ordinary public meaning of [the statute's] terms at the time of its enactment," Bostock v. Clayton Cnty., Ga, 207 L. Ed. 2d 218, 140 S. Ct. 1731, 1738 (2020). To do so, this Court turns to the contemporary medical definitions contained in the versions of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM") current when the statute was passed. See Hall v. Florida, 572 U.S. 701, 704, 134 S. Ct. 1986, 188 L. Ed. 2d 1007 (2014) (describing the DSM as "one of the basic texts used by psychiatrists and other experts")." In so doing, it finds that gender dysphoria is distinct from "gender identity disorders" as understood in 1990.

7

The DSM-III, published in 1980, defines "gender identity disorders" as a subclass of psychosexual disorders "characterized by the individual's feelings of discomfort and inappropriateness about his or her anatomic sex and *by persistent behaviors generally associated with the other sex*." Lange v. Houston Cnty., Ga, 608 F. Supp. 3d 1340, 1362 (M.D. Ga. 2022) (quoting Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders — Third Edition 261 (1980) (DSM-III) (emphasis added)).

The DSM-III-R, published in 1987, states that "[t]he essential feature" of the disorders in the category of gender identity disorders is "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psych. Ass'n, Diagnostic and Statistical Manual of Mental Disorders 71 (3d ed., rev. 1987) (DSM-III-R). The specific diagnosis of gender identity disorder in adulthood has two essential features: "a persistent or recurrent discomfort and sense of inappropriateness about one's assigned sex," *and* "persistent or recurrent cross-dressing in the role of the other sex." Id. at 76.

The DSM-5-TR did away with the overarching category of "gender identity disorders," replacing it with a new category, "gender dysphoria." See Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision 511(DSM-5-TR) (2022) ("In this chapter, there is one overarching diagnosis of gender dysphoria, with separate developmentally appropriate criteria sets for children and for adolescents and adults.") The specific diagnosis of "gender identity disorder" is also gone. According to the DSM-5-TR, published in 2022, gender dysphoria is diagnosed by:

> a marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
3. A strong desire for the primary and/or secondary sex characteristics of the other gender
4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender)
5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender)
6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

Id. at 512-13.

To meet the criteria for diagnosis, the condition must also be associated with "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Id. at 513.

There are obvious differences between the definition of gender identity disorders in the DSM-III-R and the diagnosis of gender dysphoria in the DSM-5. Most notably, the new diagnosis of gender dysphoria lacks a behavioral component and now includes a requirement of "clinically significant" distress.

Some courts considering the issue have found that the persistence of a sense of incongruence makes the diagnoses so similar that gender dysphoria must be included in the statutory exclusion. In Lange, for example, the Middle District of Georgia found that, because gender identity disorders were characterized by a sense of incongruence between anatomic sex and gender identity, they clearly included gender dysphoria, which also involved that sense of incongruence.  See, e.g., Lange, 608 F. Supp. 3d at 1362

("The DSM-III further defined the essential feature of the gender identity disorders subclass as an incongruence between anatomic sex and gender identity. The descriptive term used in the DSM-III clearly includes the subsequently refined specific diagnosis of gender dysphoria.") (internal quotation marks and citations omitted).

In contrast, the Fourth Circuit recently held that the new focus on "clinically significant distress" in the diagnosis of gender dysphoria means it cannot be considered a gender identity disorder as understood in 1990. Williams, 45 F.4th at 769 ("the APA's removal of the 'gender identity disorder' diagnosis and the addition of the 'gender dysphoria' diagnosis to the DSM-5 reflected a significant shift in medical understanding. The obsolete diagnosis focused solely on cross-gender identification; the modern one on clinically significant distress. … [W]e agree with Williams that, as a matter of statutory construction, gender dysphoria is not a gender identity disorder.").

This Court finds the Fourth Circuit's reasoning more persuasive for two reasons. First, there is a marked difference between the earlier diagnosis's focus on cross-gender *behaviors* and the new focus on perceptions and distress. [1] While the DSM-III-R required persistent or recurrent cross-dressing, at least in adults, for a diagnosis of gender identity disorder, a diagnosis of gender dysphoria does not require cross-gender behaviors. Additionally, the new focus on "clinically significant distress" required for a diagnosis of gender dysphoria marks a change from the "sense of incongruence" used to describe the broad category of "gender identity disorders," and from the "persistent or recurrent

---

[1] No court has yet commented on the behavioral component of the diagnosis of gender identity disorders, and the lack of a behavioral component in the diagnosis of gender dysphoria. But this Court finds this reading to be justified both by the texts of the relevant versions of the DSM and by the statutory language discussed below.

discomfort" found in the specific diagnosis of gender identity disorder. <u>See</u> DSM—III-R at 71, 76. Rather than focusing on the sense of incongruence per se, the diagnosis of gender dysphoria focuses on clinically significant distress that may accompany that sense of incongruence. These two distinctions strongly suggest that gender dysphoria is not a "gender identity disorder" as conceived of in 1990.

A second reason for this Court's finding that gender dysphoria is not excluded by Section 12211 comes from a close examination of the statutory text.[2]  Under conventional rules of grammar, "[w]hen there is a straightforward, parallel construction that involves all nouns or verbs in a series," a modifier at the end of the list "normally applies to the entire series." <u>Facebook, Inc. v. Duguid</u>, ___ U.S. ___, 141 S. Ct. 1163, 1169–70, 209 L. Ed. 2d 272 (2021) (quoting A. Scalia & B. Garner, <u>Reading Law: The Interpretation of Legal Texts</u> 147 (2012) (quotation modified)). The Supreme Court often applies this interpretative rule, usually referred to as the "series-qualifier canon." <u>See</u> <u>Paroline v. United States</u>, 572 U.S. 434, 447, 134 S. Ct. 1710, 188 L. Ed. 2d 714 (2014) (citing <u>Porto Rico Ry., Light & Power Co. v. Mor</u>, 253 U.S. 345, 348, 40 S. Ct. 516, 64 L. Ed. 944 (1920)); <u>see also</u> <u>United States v. Bass</u>, 404 U.S. 336, 339–340, 92 S. Ct. 515, 30 L. Ed. 2d 488 (1971).

---

[2] Some courts have come to a different conclusion by focusing on the use of the plural "gender identity disorders" in the statute. <u>See, e.g.</u>, <u>Duncan v. Jack Henry & Assocs., Inc.</u>, 617 F. Supp. 3d 1011, 1056 (W.D. Mo. 2022) ("Under the plain language, § 12211(b)(1) excludes from ADA coverage a 'gender identity disorder' in the categorical sense (rather than as a specific diagnosable condition). The plain language of the statute indicates Congress did not merely exclude as a disability under the ADA the *diagnosis* of "gender identity disorder" as previously set forth in the DSM. … Rather than exclude a specific diagnosis, … the plain language indicates Congress intended to exclude from ADA-covered disabilities gender identity disorders not resulting from physical impairment as a general category.") (emphasis added); <u>Doe v. Northrop Grumman Sys. Corp.</u>, 418 F. Supp. 3d 921, 929 (N.D. Ala. 2019) (recognizing § 12211(b)(1) as "utilize[ing] the descriptive term . . . 'gender identity disorders,'" and holding that "the terms 'gender identity disorder' and 'gender dysphoria' are legally synonymous" for purposes of ruling on the motion to dismiss). This Court finds the presence of the phrase "or other sexual behavior disorders" to be more useful in determining the proper interpretation of the text.

Section 12211 (b)(1) contains such a series: "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments" is a "straightforward, parallel" list of excluded conditions. 42 U.S.C. § 12211 (b)(1). And at the end is a qualifier that applies to the entire series: "or other sexual behavior disorders." The qualifier suggests that Section 12211 is a list of *behavior* disorders, and the listed terms do, in fact, have a behavioral component. Transvestism[3], pedophilia[4], exhibitionism[5], and voyeurism[6] all involve either actions or distressing urges to act. The behavioral component of "transsexualism" is less obvious: the DSM-III-R states that its essential features are "a persistent discomfort and sense of inappropriateness about one's assigned sex in a person who has reached puberty" and a "persistent preoccupation with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex." DSM-III-R at p. 74. But the DSM-III-R specifies that people with the disorder "*dress in clothes of the other sex.*" Id. (emphasis added). "Transsexualism," as understood in 1987, then, also involved a behavioral component.

The diagnosis of gender identity disorder found in the DSM-III-R also has a

---

[3] The essential feature of "transvestic fetishism," or transvestism, is "recurrent, intense, sexual urges and sexually arousing fantasies, of at least six months' duration, involving cross-dressing. The person has acted on these urges, or is markedly distressed by them." DSM-III-R 288.

[4] The essential feature of pedophilia is "recurrent, intense, sexual urges and sexually arousing fantasies, of at least six months' duration, involving sexual activity with a prepubescent child. The person has acted on these urges, or is markedly distressed by them." DSM-III-R 284.

[5] The essential feature of exhibitionism is "recurrent, intense, sexual urges and sexually arousing fantasies, of at least six months' duration, involving the exposure of one's genitals to a stranger. The person has acted on these urges, or is markedly distressed by them." DSM-III-R 282.

[6] The essential feature of voyeurism is "recurrent, intense, sexual urges and sexually arousing fantasies, of at least six months' duration, involving the act of observing unsuspecting people, usually strangers, who are either naked, in the process of disrobing, or engaging in sexual activity. The person has acted on these urges, or is markedly distressed by them." DSM-III-R 289.

behavioral component. The diagnosis, as discussed above, requires both "a persistent or recurrent discomfort and sense of inappropriateness about one's assigned sex" and "persistent or recurrent cross-dressing in the role of the other sex." <u>See</u> DSM-III-R at 76. In other words, gender identity disorder, with its behavioral component, fits into Section 12211's series, understood as "sexual behavior disorders." Gender dysphoria, on the other hand, has no behavioral component. Gender dysphoria, then, cannot be understood as a falling within the broad category of "sexual behavior disorders" excluded by Section 12211.

The ordinary public meanings of "gender identity disorders," "gender identity disorder," and "gender dysphoria" are distinct. The phrase "or other sexual behavior disorders" indicates that the disorders excluded by Section 12211 are "behavior disorders," something gender dysphoria is not. And Congress has directed courts to construe the definition of disability "in favor of broad coverage of individuals under this chapter," 42 U.S.C. § 12102 (4)(A). For all these reasons, this Court concludes that the diagnosis of gender dysphoria is not categorically excluded by Section 12211. CSX's argument that Kozak's condition is excluded from ADA coverage is therefore unpersuasive.[7]

---

[7] Kozak also asks this Court, if it finds that "gender identity disorders not resulting from physical impairments" are excluded, to reopen discovery and allow her time to develop evidence that her gender dysphoria does result from a physical impairment. (Docket No. 64 at p. 19.) Given the above finding, this request is moot.  Further, Kozak has not shown good cause to reopen discovery, as this Court discussed in its decision denying her request to amend her complaint. (See Docket No. 64 at pp. 7-10) In analyzing a request to re-open discovery, courts consider whether trial is imminent, whether the request is opposed, whether the non-moving party would be prejudiced, whether the moving party was diligent in obtaining discovery within the guidelines established by the court, the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and the likelihood that the discovery will lead to relevant evidence. <u>Moroughan v. Cnty. of Suffolk</u>, 320 F. Supp. 3d 511, 515 (E.D.N.Y. 2018) (citing <u>Pharmacy, Inc. v. Am. Pharm. Partners, Inc.</u>, No. CV 05-776 DRH AKT, 2008 WL 4415263, at *3 (E.D.N.Y. Sept. 24, 2008). This Court finds that the issues of prejudice and foreseeability, in particular, weigh heavily against Kozak here.

### 3. Kozak has not presented evidence from which a reasonable jury could find that she is disabled.

Although this Court finds that gender dysphoria is not per se excluded from the ADA's definition of disability, that does not end the inquiry. To prevail on her ADA discrimination claim, Kozak must show that (1) CSX is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she was otherwise qualified to perform her job functions; and (4) she suffered an adverse employment action because of her disability. Fasan v. McRoberts Protective Agency Inc., No. 13-CV-4658 RRM LB, 2015 WL 1285909, at *6 (E.D.N.Y. Mar. 20, 2015) (citing Sista v. CDC Ixis N. Am. Inc., 445 F.3d 161, 169 (2d Cir. 2006)).

CSX argues that, even if gender dysphoria is not categorically excluded, Kozak has not presented evidence from which a reasonable a jury could find that her gender dysphoria "substantially limits" her in a "major life activity," such that she is disabled within the meaning of the ADA.

As discussed above, the ADA, as amended in 2009, defines a disability as a physical or mental impairment that substantially limits one or more of the major life activities of such individual. 29 C.F.R. § 1630.2 (g)(1)(i). In contrast to caselaw that had developed before the 2009 amendments, the regulations now state that "[t]he term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not meant to be a demanding standard."  29 C.F.R. § 1630.2 (j)(1)(i).

"An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity *as compared to most people in the general population*." Id. § 1630.2 (j)(1)(ii). While "[a]n impairment need not prevent,

or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting, … not every impairment will constitute a disability within the meaning of this section." Id.

The interpretative guidance to the regulations states that the question of whether an individual has a disability under this part "should not demand extensive analysis." 29 C.F.R. § Pt. 1630, App.

Pursuant to the amendments, then, while a court should construe the term "substantially limits" broadly, some evidence is still required demonstrating a plaintiff's limitations as compared to the population at large.  At the summary judgment stage, this means Kozak must present admissible evidence of her limitation and that it is greater than that of most people in the population. Compare Kopchik v. Town of E. Fishkill, N.Y., 759 F. App'x 31, 37 (2d Cir. 2018) (remanding where plaintiff presented medical evidence of learning issues after head injury), Parada v. Banco Indus. De Venezuela, C.A., 753 F.3d 62, 68 (2d Cir. 2014) (remanding where Plaintiff presented medical evidence of difficulty sitting), and DeAngelo v. Yellowbook Inc., 105 F. Supp. 3d 166, 174–75 (D. Conn. 2015) (denying summary judgment to defendant where medical records indicated that plaintiff underwent chemotherapy sessions between October 2010 and February 2011 that left him weak, lethargic, and short of breath), with Morey v. Windsong Radiology, 794 F. App'x 30, 33 (2d Cir. 2019) (affirming dismissal where plaintiff failed to assert facts as to how her asserted disability (height of four feet five inches tall) substantially limited her major life activities), Anderson v. Nat'l Grid, PLC, 93 F. Supp. 3d 120, 135 (E.D.N.Y. 2015) (granting summary judgment to defendant where plaintiff submitted only own affidavit and co-worker's deposition testimony, but no medical

documentation, to support asserted inability to sit), and Peterec–Tolino v. Comm. Elec. Contractors, Inc., No. 08–CV–0891 (RMB), 2011 WL 5105474, at *6 (S.D.N.Y. Oct. 26, 2011) ("Plaintiff's failure to provide medical documentation of his asthma also undermines a claim of substantial limitation.").

Much of the caselaw CSX cites in arguing that Kozak's frequent urination does not render her "substantially limited" predates the 2009 amendments, rendering them less persuasive. (Docket No. 50-12 at p. 19.) But even looking only to post-2009 caselaw while considering the evidence in the light most favorable to Kozak, this Court finds that Kozak has not presented sufficient evidence from which a jury could find her "substantially limited" either by her gender dysphoria or by the diuretic side effects of her hormone medication.

Kozak asserts that her gender dysphoria caused two kinds of symptoms: emotional distress and urinary frequency (caused by the spironolactone she took to treat her gender dysphoria). She does not argue that the emotional distress limited her functioning, but argues that her urinary frequency caused her to be "substantially limited" in two major areas: genitourinary functioning and "working."

Having carefully reviewed the record in this case, this Court finds insufficient evidence from which a jury could decide in Kozak's favor. First, the record contains no evidence as to when or for how long Kozak took spironolactone. The only medical record Kozak submits is from a June 2020 appointment and that record indicates only that she was no longer taking spironolactone. (See Docket No. 70-3 at p. 1 (indicating that Kozak was off spironolactone "at this time.")) Moreover, there is no statement, either by Kozak or by a medical provider, as to how frequently Kozak needed to urinate while taking

16

spironolactone, which precludes comparison with an "average" person, as required. Nor is there any statement asserting that Kozak experienced urinary urgency and/or pain. In her declaration, Kozak asserts that she advised Lewandowski "that [she] would need to urinate more frequently and urgently because of the medication." (Docket No. 68, ¶ 7.) She further asserts, "every time I went to work switching trains in the yard, I was aware that I needed to be careful to take the opportunity to urinate whenever there was a break or a pause in the action to avoid incapacitating pain and damage to my urinary tract." (Id., ¶ 11.) These do not demonstrate any facts about the impact spironolactone had on her overall urinary functioning.

The record also contains a one-page printout on spironolactone from the Mayo Clinic's website. (Docket No. 70-18.) Leaving aside CSX's arguments about the admissibility of this document, this Court finds that, even assuming admissibility, the information contained on this page is not relevant. The page lists the uses for spironolactone, which include high blood pressure, hyperaldosteronism, and congestive heart failure. (Id. at p. 2.) It mentions that spironolactone is used to treat fluid retention, but it does not indicate that it has a diuretic effect in all patients, let alone that it causes a frequent, uncontrollable, or painful need to urinate. (Id.)

Finally, Kozak's statements about the impact of her impairment on her daily functioning are both inconclusive and inconsistent. At her deposition, when asked about her disability, Kozak regularly described the emotional challenges caused by her gender dysphoria and her gender transition, not any frequency or urgency of urination. (See, e.g., Docket No. 70-20 at pp. 15-16.) When questioned about what activities of daily living she was unable to perform because of her disability, she answered, "it was the mental health

17

aspect …It was all on my mind that I am trans, I came out … I had consistent anxiety of going to work every day." (Id. at 17.) Apart from one statement that she experienced "frequent urination" as a side effect of spironolactone, the urination issue did not arise in deposition. (Id. at p. 28.)

Kozak's declaration in opposition to CSX's motion, likewise, contains few assertions of facts as to her limitations. She asserts that when she discussed her gender transition with Mike Lewandowski, she "advised him then that [she] would need to urinate more frequently and urgently because of the [spironolactone]." (Docket No. 68, ¶ 1.) A further assertion appears to be completely conclusory: "[h]ad I not been able to use the outdoors for urination, the changes to my genitourinary system because of my gender transition and gender dysphoria, as compared to the average worker in the yard, who could hold their urinary needs more effectively, would have been significantly reduced." (Id., ¶ 9.)

These conclusory statements are simply not enough to allow a reasonable jury to conclude that Kozak was "significantly limited," as compared with the population at large, in her genitourinary functioning. Further, as Kozak herself argues, her fellow workers in the yard regularly relieved themselves outdoors when they felt the urge to urinate, as she did. She therefore fails to distinguish her urinary issues from those faced by the rest of the population.

Kozak also argues that she is substantially limited in the area of "working." To show a substantial limitation in "working," a plaintiff must demonstrate that her "limitation affects the ability to perform a class ... or broad range of jobs." Woolf v. Strada, 949 F.3d 89, 94 (2d Cir. 2020). If a plaintiff shows that the condition leaves her "unable to perform only a

single, specific job, [s]he has failed to establish a substantial impairment to [her] major life activity of working." Dawson v. Sec. Servs. of Conn. Inc., No. 3:20-CV-01310 (SVN), 2022 WL 17477601, at *12 (D. Conn. Dec. 6, 2022).

Kozak does not address this issue or provide any evidence to establish that she is unable to perform a class or range of jobs. Woolf, 949 F.3d at 94. A jury could therefore not reasonably find that she has a substantial impairment to her major life activity of working.

Having reviewed the record in detail, this Court finds that there is insufficient evidence from which a reasonable jury could find that Kozak's gender dysphoria limits her ability to perform tasks constituting a "major life activity," much less "substantially limits" that function, compared to the general population. A jury could not draw any conclusions about whether Kozak experiences any functional limitations, or about the scope of those limitations, from the evidence she presents: her diagnosis; the one-page medical record; or her deposition testimony and declaration. Kozak's ADA claim cannot withstand summary judgment because she has not brought forth sufficient evidence from which a jury could find that her gender dysphoria substantially limits her in a major life activity. And because Kozak has failed to bring forth sufficient evidence that she is disabled under the ADA, she also fails to establish a prima facie failure-to-accommodate claim. CSX's motion seeking summary judgment on these claims will therefore be granted.

### 4.  Kozak's NYSHRL Disability Discrimination Claim survives

The term disability is more broadly defined under the NYSHRL than under the ADA. Thomson v. Odyssey House, No. 14-CV-3857 MKB, 2015 WL 5561209, at *18

(E.D.N.Y. Sept. 21, 2015), aff'd, 652 F. App'x 44 (2d Cir. 2016) ("The NYSHRL and NYCHRL 'have a broader definition of 'disability' than does the ADA; neither statute requires any showing that the disability substantially limits a major life activity.") (citing Reilly v. Revlon, Inc., 620 F. Supp. 2d 524, 541 (S.D.N.Y. 2009); see also Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 233 (2d Cir. 2000). The NYSHRL defines disability as "(a) a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques or (b) a record of such an impairment or (c) a condition regarded by others as such an impairment, provided, however, that in all provisions of this article dealing with employment, the term shall be limited to disabilities which, upon the provision of reasonable accommodations, do not prevent the complainant from performing in a reasonable manner the activities involved in the job or occupation sought or held." Arazi v. Cohen Bros. Realty Corp., No. 1:20-CV-8837-GHW, 2022 WL 912940, at *7 (S.D.N.Y. Mar. 28, 2022) (quoting N.Y. Exec. Law § 292 (21)).

Apart from this difference, disability discrimination claims under the NYSHRL are analyzed identically to federal ADA claims. Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 n.3 (2d Cir. 2006) (citing Parker v. Columbia Pictures Indus., 204 F.3d 326, 332 n. 1 (2d Cir. 2000)).

CSX does not argue that Kozak is not disabled under the NYSHRL. (Docket No. 50-12 at p. 28 n. 5). Rather, it argues that she has failed to show that she was treated less well because of her disability.

Claims alleging disability discrimination in violation of the ADA are usually subject

to the burden-shifting analysis originally established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). McMillan v. City of New York, 711 F.3d 120, 125 (2d Cir. 2013) (citing McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (internal citation omitted)). "[W]hen the reason given by the employer for the adverse employment action is unrelated to the employee's disability, the McDonnell Douglas approach can be used to weed out non-viable claims of discrimination based on circumstantial evidence." McMillan, 711 F.3d at 129. When the parties agree that the complained-of conduct is the direct result of the employee's disability, however, "there is no need to evaluate whether the employer's adverse employment action made in response to that conduct is pretextual." Id. (citing Teahan v. Metro–N. Commuter R.R. Co., 951 F.2d 511, 514, 516 (2d Cir. 1991)).

Here, assuming that Kozak has established that her urination was disabled behavior under the less demanding NYSHRL standard, a jury could find that she was disciplined because of her disability—i.e. her urination.

CSX argues that Kozak must set forth evidence that the decision makers knew of her disability when they decided to terminate her, and that she has failed to do so. But Kozak asserts that she told Lewandowski of her need to urinate more frequently when she discussed her transition with him in December 2018. (Docket No. 68, ¶¶ 5-7.) And CSX itself argues that Lewandowski played a role in the decision to initiate disciplinary proceedings against Kozak. (See Docket No. 50-12 at p. 27.) Thus, there is sufficient evidence that the decision makers knew of Kozak's disability when they dismissed her. Accordingly, because a jury could find that Kozak was dismissed because of her disability, summary judgment is not warranted on her NYSHRL claim.

As this Court discusses below, because Kozak's Title VII claim survives summary judgment, this Court will retain supplemental jurisdiction over her NYSHRL disability discrimination claim. "A district court's exercise of supplemental jurisdiction is governed by 28 U.S.C. § 1367 (a), which states, in pertinent part, that 'the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.'" Eng v. City of New York, 715 F. App'x 49, 54 (2d Cir. 2017) (summary order) (quoting 28 U.S.C. § 1367 (a)). "For purposes of section 1367(a), claims form part of the same case or controversy if they derive from a common nucleus of operative fact." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011) (internal citation and quotation marks omitted). Here, both of Kozak's discrimination claims arise from the same facts, and therefore form the same case or controversy such that this Court may exercise supplemental jurisdiction over her New York discrimination claim.

**B.     Sex Discrimination under Title VII**

CSX argues that Kozak has not made a prima facie case of sex discrimination and that she has not met her burden of showing that its reason for dismissing her was a pretext.  Kozak argues that she has met her burden on both fronts.

**1.  Legal Standard**

Title VII prohibits an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Claims of disparate treatment under Title VII are assessed using the McDonnell

Douglas burden-shifting framework. See Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 156 (2d Cir. 2010). Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. Henry, 616 F. 3d at 156 (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993); see also Dowrich–Weeks v. Cooper Square Realty, Inc., 535 F. App'x. 9, 11 (2d Cir. 2013). A plaintiff's burden at this stage is "minimal." Holcomb v. Iona Coll., 521 F.3d 130, 139 (2d Cir. 2008) (quoting St. Mary's Honor Ctr., 509 U.S. at 506).

To establish a *prima facie* case of employment discrimination under Title VII, a plaintiff must show that: "(1) [s]he belonged to a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012).

If the plaintiff satisfies this initial burden, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions. St. Mary's Honor Ctr., 509 U.S. at 506–07. The defendant's burden "is not a particularly steep hurdle." Hyek v. Field Support Servs., 702 F.Supp.2d 84, 93 (E.D.N.Y. 2010). It "is one of production, not persuasion; it 'can involve no credibility assessment.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting St. Mary's Honor Ctr., 509 U.S. at 509)). If the employer satisfies its burden, the inquiry then returns to the plaintiff, to demonstrate that the proffered reason is a pretext for discrimination. McDonnell Douglas, 411 U.S. at 804. To defeat summary judgment, a plaintiff need only show "that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the

employer's decision." <u>Univ. of Texas Sw. Med. Ctr. v. Nassar</u>, 570 U.S. 338, 343, 133 S. Ct. 2517, 2523, 186 L. Ed. 2d 503 (2013).

### 2. Kozak's sex discrimination claim survives summary judgment.

#### a. Prima facie case

The parties do not dispute that Kozak, a transgender woman, is a member of a protected class, that she is qualified for her job, and that she suffered an adverse employment action. <u>See</u> <u>Bostock</u>, 140 S. Ct. 1731. CSX argues, however, that Kozak has not met the fourth prong of a *prima facie* case—she has not pointed to circumstances indicating discrimination. This Court disagrees.

"Under Title VII, discriminatory intent can be shown by either direct evidence of discriminatory animus or circumstantial evidence of such animus, including by showing disparate treatment among similarly situated employees." <u>Radwan v. Manuel</u>, 55 F.4th 101, 132 (2d Cir. 2022) (citing <u>Gordon v. N.Y.C. Bd. of Educ.</u>, 232 F.3d 111, 117 (2d Cir. 2000)).

Here, Kozak submits statements from fellow employees that it was a common practice at CSX to urinate outdoors in the railyard. Kozak asserts that she was disciplined for this behavior while non-transgender employees were not.

CSX argues that Kozak has not brought forth any evidence that it knew that any other employees engaged in this practice. But Kozak described an incident of a fellow worker, Stefani, urinating out of an engine window in the yard and not being disciplined even after Lewandowski was informed of his conduct. (<u>See</u> Docket No. 68, ¶ 61.) Along with the employee statements, this suffices, at this stage, to establish that non-transgender employees were treated differently when they urinated on the job.

24

CSX also argues that what the other CSX employees describe—urinating outdoors when "far" from a restroom—is factually distinct from Kozak's urinating outdoors when she was "near" a restroom. But the proximity of a restroom to Kozak on the day in question is a factual matter that cannot be resolved here.

As additional support for an inference of discriminatory intent, Kozak submits evidence that Dellinger, who followed Kozak with her camera, reported Kozak's conduct, and took part in the hearing against her, harbored an anti-transgender bias. Joseph Stachewicz testified that he was "witness to hearing Trainmaster Amanda Dellinger state off-color opinions of Miss Kozak's transitioning into a woman," and that he "overheard her saying that it was unnatural and disgusting and against God." (See Docket No. 70-6 at p. 2.) The parties' arguments about the role Dellinger played in Kozak's termination will be discussed at greater length below; at this stage, because Dellinger played a role in Kozak's dismissal, it suffices as circumstantial evidence of discriminatory intent.

### b.  Legitimate, nondiscriminatory reason

The burden of production now shifts to CSX to provide a legitimate, nondiscriminatory reason for dismissing Kozak. CSX asserts that Kozak urinating on the shanty is a legitimate and nondiscriminatory reason for dismissing her. "Discharging an employee for violating company policies constitutes a legitimate and nondiscriminatory reason for terminating employment." Shunway v. United Parcel Serv., Inc., 118 F.3d 60, 65 (2d Cir.1997) (holding that discharging employee for violating company's no-fraternization policy was legitimate and nondiscriminatory); Swanston v. Pataki, No. 97 Civ. 9406, 2001 WL 406187 at *4 (S.D.N.Y. Apr.20, 2001) (stating that even where a company's conflict policy is open to multiple interpretations, if the company puts forth a

reasonable reading of the policy as the basis for termination, that will "serve to meet [d]efendants' burden of proffering a legitimate non-discriminatory reason."). Although CSX does not point to any company rule explicitly prohibiting Kozak's behavior, CSX's burden here is minimal and this Court may not make any credibility determinations regarding CSX's reason. <u>Reeves</u>, 530 U.S. at 142. CSX has thus met its burden of production.

### c.  A reasonable jury could find that CSX's reason was pretextual

The burden now shifts back to Kozak, who must bring forth evidence from which a reasonable jury could find that the reason given by CSX was a pretext for discrimination. The same evidence may be used for a prima facie case and to show pretext. <u>Radwan</u>, 55 F.4th at 139 ("This evidence not only was sufficient to establish a *prima facie* case of selective enforcement but also, along with the other evidence discussed below, provides support for Radwan's overall effort to rebut UConn's non-discriminatory reasons for her discipline."); <u>see also</u> <u>Bentley v. AutoZoners, LLC</u>, 935 F.3d 76, 89 (2d Cir. 2019) (explaining that, with respect to the ultimate burden under the <u>McDonnell Douglas</u> framework, "[a] plaintiff may carry this burden by reference to the same evidence used to establish a *prima facie* case, provided that the evidence admits plausible inferences of pretext").

This Court finds that Kozak has brought forth sufficient evidence to permit a jury to find that CSX's reason is a pretext. First, there is no evidence of a written rule against urinating outside. The rules cited do not reference urination. Dellinger herself had to explain at the hearing how Kozak's conduct violated CSX's rules. Further, the fact that other employees had a practice of urinating outside without being disciplined would

provide evidence of pretext, if believed by a jury. While questions of fact remain as to how far these employees were from restrooms when they did so, and how far Kozak was from a restroom when she urinated in the yard, at this stage, the disparate treatment of similarly situated employees provides sufficient evidence of pretext. Olaechea v. City of New York, No. 17-CV-4797 (RA), 2019 WL 4805846, at *13 (S.D.N.Y. Sept. 30, 2019). See also Mathew v. N. Shore-Long Island Jewish Health Sys., 582 F. App'x 70, 71 (2d Cir. 2014) (recognizing that pretext may be established by showing that an employee was treated differently than other 'similar situated' employees); Graham, 230 F.3d at 43.

In fact, evidence in the record suggests that tolerating outdoor urination may have actually benefited CSX by allowing workers not to delay trains. For example, Kozak testified, "they have a thing at CSX where you gotta switch up so many cars per day. If you don't switch 200 cars per day or move 200 cars per day they can charge you with delaying trains. So I always try to go to the bathroom whenever we had a pause." (Docket No. 50-2 at p. 13.) Likewise, Kozak submits an email by Steven Hrycyszyn asserting that "it is common to use the great outdoors for a restroom.  A lot of times you aren't close to a bathroom when the urge comes on! The way this company wants us to do all of this work, you have to 'go wherever you are' just so that you don't get in trouble for delaying trains." (Docket No. 70-2 at p. 4.) This evidence, if believed, could further convince a jury that CSX's reason for disciplining Kozak was pretextual.

Dellinger's alleged bias could also support the conclusion that Kozak's urination was a pretext for her dismissal. CSX argues that, even if Dellinger made the alleged anti-transgender statements, the chain of causation between her actions and Kozak's dismissal is too attenuated to hold CSX liable for Dellinger's bias. CSX asserts that

27

Lewandowski, not Dellinger, made the decision to initiate disciplinary proceedings against Kozak. It further asserts that decisionmakers at CSX headquarters, not Dellinger, made the ultimate decision to dismiss Kozak.

But this Court finds that Kozak has convincingly made a case for "cat's paw liability." In situations where "an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action," courts have adopted a theory known as "cat's paw liability." Vasquez v. Empress Ambulance Serv., Inc., 835 F.3d 267, 271–72 (2d Cir. 2016) (quoting Cook v. IPC Intern. Corp., 673 F.3d 625, 628 (7th Cir. 2012) (Posner, J.)). "The phrase derives from an Aesop fable, later put into verse by Jean de La Fontaine, in which a wily monkey flatters a naïve cat into pulling roasting chestnuts out of a roaring fire for their mutual satisfaction; the monkey, however, 'devour[s] ... them fast,' leaving the cat "with a burnt paw and no chestnuts" for its trouble." Id. "[T]he 'cat's paw' metaphor now 'refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.'" Id. "In other words, by merely effectuating or 'rubber-stamp[ing]' a discriminatory employee's 'unlawful design,' the employer plays the cat to the malevolent monkey and, in so doing, allows itself to get burned—i.e., successfully sued." Vasquez, 835 F.3d at 272 (quoting Nagle v. Marron, 663 F.3d 100, 117 (2d Cir. 2011)).

"Only when an employer in effect adopts an employee's unlawful animus by acting

28

*negligently* with respect to the information provided by the employee, and thereby affords that biased employee an outsize role in its own employment decision, can the employee's motivation be imputed to the employer and used to support a claim under Title VII." Vasquez, 835 F.3d at 275 (emphasis in original).

Here, a jury could find that Dellinger played a significant—even "outsize"—role in all stages of Kozak's dismissal: by turning her camera to follow Kozak; by authoring the charge against Kozak; by testifying at the hearing; by being allowed to leave the hearing to obtain a "statement of law;" and by CSX's adoption of her interpretation of the law as the basis upon which Kozak was ultimately adjudged guilty. A jury could find that CSX effectively adopted Dellinger's version not only of Kozak's conduct (as "discourteous") but of CSX's rules and New York law in its decision to dismiss Kozak.

CSX also argues that the fact that Kozak's admission to urinating in the yard means that there is no way her dismissal could have been discriminatory. But the question for the jury is not what Kozak did, but why CSX did what it did. And if a jury could find that sex-based discrimination was a factor in her termination, summary judgment is not warranted. Nasser, 570 U.S. at 343.

For all these reasons, this Court finds sufficient evidence from which a reasonable jury could find that CSX's proffered reason for dismissing Kozak was a pretext for discrimination. CSX's motion for summary judgment on Kozak's sex-discrimination claim will therefore be denied.

## IV.  CONCLUSION

Because this Court finds that Kozak has not submitted sufficient evidence from

which a jury could find her disabled under the ADA, CSX's motion for summary judgment will be granted as to that claim. But CSX's motion for summary judgment as to her NYSHRL claim will be denied, because a reasonable jury could find that she was dismissed because of her disability. Further, because a reasonable jury could find that Kozak's transgender status was a cause of her dismissal, CSX's motion will be denied as to that claim.

## V.   ORDERS

IT HEREBY IS ORDERED, that CSX's Motion for Summary Judgment (Docket No. 50) is GRANTED IN PART and DENIED IN PART.

FURTHER, that CSX's Motion for Summary Judgment as to Kozak's ADA claim is GRANTED, but its motion as to her New York State Human Rights Law disability discrimination claim is DENIED.

FURTHER, that CSX's motion as to Kozak's Title VII sex discrimination claim is DENIED.

FURTHER, that the parties are DIRECTED to engage in additional mediation with Mediator Ann E. Evanko by August 30, 2023.

FURTHER, that the parties must conclude their mediation efforts and file a joint written notice concerning the status of mediation by September 30, 2023.

SO ORDERED.

Dated:      August 1, 2023
            Buffalo, New York


                                            s/William M. Skretny
                                          WILLIAM M. SKRETNY
                                       United States District Judge